UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J. ANTHONY MARKS, et al.,

    Plaintiffs,                                        Case No. 20-11059
vs.                                                       HON. MARK A. GOLDSMITH

SCHAFER AND WEINER, PLLC,
et al.,

    Defendants.
_____/

**OPINION & ORDER
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS OR FOR SUMMARY JUDGMENT (Dkt. 14)**

Plaintiffs J. Anthony Marks and TMT, Inc. have filed an attorney malpractice and breach of contract suit against Defendants Schafer and Weiner, PLLC; Leon Mayer; Brendan Best; Howard Borin; and John Stockdale. See First Am. Compl. ("FAC") (Dkt. 4). Defendants have filed a motion to dismiss or for summary judgment raising three issues: (i) whether Defendants had an attorney-client relationship with Marks, (ii) whether Plaintiffs' claims of malpractice are barred by the statute of limitations or statute of repose, and (iii) whether Plaintiffs' breach of contract claim is defective (Dkt. 14).

Defendants are entitled to summary judgment on Marks's malpractice claim, because he had no attorney-client relationship with them. They are also entitled to dismissal of the breach of contract claims asserted by both TMT, Inc. and Marks, because a complaint about whether attorney services were properly performed sounds only in malpractice. Defendants are not entitled to summary judgment on TMT, Inc.'s malpractice claim based on the statute of limitations and the statute of repose, because there are factual questions as to when any alleged malpractice was or should have been discovered and when it occurred.

## I. BACKGROUND

Marks incorporated TMT Logistics, Inc. on November 1, 2000, as its sole shareholder. FAC ¶¶ 9-10. Several other companies Marks owned were merged into TMT Logistics, which then became TMT, Inc. Id. ¶ 12. While operating under a receivership requested by First Merit Bank, a mortgagee for one its properties, TMT, Inc. failed to pay federal payroll withholding/FICA taxes in June, September, and December 2012, resulting in an unpaid tax obligation of $471,112.89. Id. ¶¶ 14-19.

Some portion of this debt constituted "trust fund" taxes, so called because the employer holds its employees' money in trust until it makes a federal tax deposit in that amount.[1] Those taxes may be assessed as a trust fund recovery "penalty" against an individual officer or manager of the employer who is responsible for collecting or paying withheld income and employment taxes and willfully fails to collect or pay them. Marks has been personally assessed with a trust fund recovery penalty, FAC ¶ 20, and Plaintiffs' lawsuit arises from Defendants' alleged failure (i) to properly advise Plaintiffs about this liability, and (ii) to assist Plaintiffs in avoiding this liability.

In January 2013, First Merit informed Marks that it planned to wind down TMT, Inc. through the receivership, and Marks sought legal representation to prevent that action and for advice regarding other legal and financial issues. Id. ¶¶ 22-23.

Plaintiffs contacted Defendants Schafer and Weiner PLLC in January 2013 and entered into a legal services agreement on February 4, 2013. See id. ¶¶ 24-29; Retainer, Ex. D to Reply

---

[1] See IRS, Employment Taxes and the Trust Fund Recovery Penalty, https://www.irs.gov/businesses/small-businesses-self-employed/employment-taxes-and-the-trust-fund-recovery-penalty-tfrp, https://perma.cc/WH3X-WCVZ.

(Dkt. 16-2).² Defendants filed a voluntary Chapter 11 petition on TMT, Inc.'s behalf in the United States Bankruptcy Court for the Northern District of Ohio (Toledo) (Case No. 13-30346). FAC ¶ 28. Defendants also filed bankruptcy petitions in the same bankruptcy court for affiliate debtors TMT Aero, Inc. (Case No. 13-30349), Tony Marks Equipment (Case No. 13-30348), and TMT Leasing, LLC (Case No. 13-30347). FAC ¶ 28 n.1.

On July 3, 2013, the IRS filed a proof of claim totaling $471,112.89, consisting of a $362,701.99 unsecured priority claim under 11 U.S.C. § 507(a)(8) and an unsecured general claim of $108,410.90. Id. ¶ 31; see also IRS Proof of Claim, Ex. C to FAC (Dkt. 4-3).

Marks stated in an affidavit, "I was concerned about potential personal liability relating to that IRS Claim based on my ownership of TMT, Inc., which I was told is called the 'trust fund' portion." Marks Aff., Ex. 1 to Resp., ¶ 8 (Dkt. 15-1). It was his understanding that $260,000 was set aside to pay the trust fund portion of the claim. Id. ¶ 9.

Defendants hired Franklin Advisors "to help calculate the trust fund portion of the IRS claim and assist with other financial issues." Id. ¶ 10. Plaintiffs have provided an email thread showing discussions between individuals including Defendants, Marks, employees of Franklin Advisors, and Marks's personal attorney H. Buswell Roberts. See July/August 2013 Emails, Ex. 1A to Resp., at PageID.154-161 (Dkt. 15-1). The emails appear to focus primarily on the attempt to satisfy the trust fund portion of the taxes using the limited funds available.

Defendants sent a letter to IRS Bankruptcy Specialist Marietta Dobbins on September 25, 2013. See 9/25/13 Letter, Ex. D to FAC (Dkt. 4-4). According to the letter, Dobbins had

---

² Plaintiffs have sued the law firm as well as affiliated attorneys Leon Mayer, Brendan Best, Howard Borin, and John Stockdale.

3

previously communicated with Louis Glazier of Franklin Advisors, and told Louis Glazier that payments could be applied to particular tax periods specified by the debtors. Id. at PageID.64.[3]

In the letter, Defendants identified the debt owed to the IRS as $312,128.28 for payroll withholding/FICA taxes and stated that according to the debtors' calculations, the trust fund portion of those taxes was only $142,172.13. Id. at PageID.64-65. The letter stated that four checks were enclosed. Id. Three of those, totaling $142,173.13, were meant to cover the trust fund taxes for the quarters ending June 30, 2012; September 30, 2012; and December 31, 2012— the three quarters for which payroll taxes were not paid. Id. The fourth check, for $25,737.10, came with the instruction that it was "for any of the Debtor's unpaid payroll 'Trust Fund' taxes for any period for which payroll trust fund taxes remain unpaid, and if no other 'Trust Fund' taxes remain unpaid, [the funds] may only be applied to any of the Debtor's other unpaid priority taxes, as defined by 11 U.S.C. § 507(a)(8)." Id.

According to Plaintiffs, Defendants continued representing Plaintiffs in the Chapter 11 proceeding, and they assured Plaintiffs the trust fund tax issue had been fully addressed and resolved. FAC ¶ 35.

Marks stated in an affidavit, "I still had some concerns about my future liability in May 2014, when the remainder of the money set aside to pay trust fund taxes was to be turned over to the creditors committee." Marks Aff. ¶ 13. Those concerns temporarily held up the process by which Defendants were to turn over $41,009 to the creditors committee in May 2014. See May

---

[3] The letter does not identify any authority for applying funds only for the trust fund portion of the taxes. On August 28, 2013, Ilana Glazier of Franklin Advisors reported the following from her communications with Dobbins: "I received a voicemail message last week from Ms. Dobbins in which she indicated that tax payments can be applied to particular periods. She did not specify in her message whether it can be allocated to specific portions of tax periods (i.e., only the trust fund taxes), however, given our experience, we are unlikely to receive this level of detail from her in any sort of timely manner, if ever." July/August 2013 Emails at PageID.155-156.

4

2014 Emails, Ex. 1B to Resp., at PageID.162-167 (Dkt. 15-1). These funds represented "the remainder of the $260,000 of funds that were originally set aside to pay trust fund taxes." Id. at PageID.162. However, Marks's concerns were apparently resolved after a conversation between Mayer and Marks, and Marks authorized the transfer of those funds. Id.

The Chapter 11 bankruptcy plan was confirmed on April 9, 2014, and the bankruptcy action was terminated on September 14, 2017. FAC ¶ 36.

Meanwhile, the IRS assessed Marks with the trust fund recovery penalty on June 21, 2016, for each of the three quarters in which TMT, Inc. failed to pay payroll taxes. See IRS Account Transcript, Ex. C to Resp. (Dkt. 14-4). The IRS account transcript shows that notices were issued on November 7, 2016, November 6, 2017, November 5, 2018, and November 20, 2019. Id. The transcript shows that a return receipt was signed for the last notice—a notice of intent to levy—on November 23, 2019. Id.

Marks denies having known anything about these assessments until early December 2019, when an IRS representative visited Marks at his home in North Carolina to tell him that he owed $206,207.63 in unpaid 2012 payroll withholding/FICA taxes. FAC ¶¶ 38-39; Marks Aff. ¶ 19. He claims that he did not discover that some portion of the trust fund the taxes had not been paid through the Chapter 11 proceeding until a subsequent conversation with Mockensturm, Ltd., his current counsel. Marks Aff. ¶ 20. Marks says he was "shocked to find out he owed money to the IRS for these taxes, as Defendants had assured him all Trust Fund tax obligations had been satisfied through the Chapter 11 Bankruptcy." FAC ¶ 40. He filed this lawsuit on April 30, 2020.

The complaint describes the alleged malpractice as follows:

> Defendants failed to exercise reasonable skill, care, discretion, and judgment by, among other ways: 1) failing to confirm the correct amount of IRS Proof of Claim 7-4; 2) failing to investigate the facts necessary to satisfy and pay the Trust Fund taxes described in the Proof of Claim; 3) failing to properly handle the Trust Fund taxes through the Chapter 11 bankruptcy; 4) incorrectly advising Plaintiffs that the Trust Fund taxes outlined on the Proof of Claim had been paid in full through the

5

> Chapter 11 Bankruptcy; and 5) failing to advise Mr. Marks that he was personally liable for the Trust Fund taxes that were not paid through the Chapter 11 Bankruptcy.

FAC ¶ 48. The complaint also alleges a breach of contract, based on the same allegations. Id. ¶ 55.

Defendants filed this motion to dismiss and/or for summary judgment (Dkt. 14) before any discovery was taken.

## II. STANDARD OF REVIEW

### A. Motion for Summary Judgment

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247-248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th

6

Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

### B. Motion to Dismiss

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007) (citing Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991)), cert. denied, 552 U.S. 1311 (2008). To survive a Rule 12(b)(6) motion, the plaintiff must allege sufficient facts to state a claim to relief above the speculative level, such that it is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The plausibility standard requires courts to accept the alleged facts as true, even when their truth is doubtful, and to make all reasonable inferences in favor of the plaintiff. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Twombly, 550 U.S. at 555-556.

Evaluating a complaint's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. Although a complaint that offers no more than "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" will not suffice, id. at 678, it need not contain "detailed factual allegations," Twombly, 550 U.S. at 555. Rather, a complaint needs only enough facts to suggest that discovery may reveal evidence of illegality, even if the likelihood of finding such evidence is remote. Id. at 556. Accordingly, a motion to dismiss "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Directv, 487 F.3d at 476 (6th Cir. 2007).

### III. ANALYSIS

**A. Attorney-Client Relationship with Marks**

Defendants first argue that they had no attorney-client relationship with Marks, which is an essential element of a malpractice claim. Marks, who bears the burden of proving an attorney-client relationship, argues that the relationship was implied by conduct. See Resp. at 5 (citing Cohen v. Jaffee Raitt Heuer & Weiss, P.C., 768 F. App'x 440, 443 (6th Cir. April 5, 2019), reh'g denied (Apr. 23, 2019)). Cohen, applying Michigan law, sets the following standard for evaluating such relationships:

> The existence of an attorney-client relationship may be implied from conduct of the parties. An attorney-client relationship exists if the conduct shows that (1) a potential client sought the advice or assistance of an attorney, (2) this advice or assistance was within the attorney's competence, and (3) the attorney agreed to or <u>actually provided</u> that advice or assistance. Ultimately, this factual question depends on the relations and mutual understanding of the parties, on what was said and done, and all the facts and circumstances of the particular undertaking.

Id. (internal quotation marks and citations omitted) (emphasis in original).

Defendants are entitled to summary judgment, primarily because they and Marks signed a retainer agreement making clear that Defendants would be representing four corporate entities, including TMT, Inc., and that they would not be representing Marks in his individual capacity.

This fact—discussed at length below—contrasts significantly with the facts in Cohen, in which the law firm never sent a written engagement letter. 768 F. App'x at 442; see also Cohen v. Jaffe, Raitt, Heuer & Weiss, P.C., No. 16-CV-11484, 2018 WL 1089723, at *3 (E.D. Mich. Feb. 28, 2018), aff'd, 768 F. App'x 440 (6th Cir. 2019) ("As to the lack of a written engagement letter, Jaffe could have limited the scope of its representation with an engagement letter clearly informing Chaffee and Cohen that their other companies were not clients. Jaffe cannot use its failure to provide an engagement letter as a defense to malpractice.").

Several portions of the retainer lead the Court to conclude, as a matter of law, that Defendants did not have an attorney-client relationship with Marks individually.

On the first page of the retainer, Defendants define the term "Clients" to include TMT, Inc.; Tony Marks Equipment, Inc.; TMT Leasing, LLC; and TMT Aero, Inc. Retainer at PageID.179. Notably, Marks himself is not listed as a client. That omission is fatal to Marks's position, because another provision of the retainer, entitled "Parties to the Agreement," emphasizes that representation of an entity "does not include a representation of the interests of the individuals or entities that are shareholders, directors, or officers of a corporation . . . [or] beneficial owners of a limited liability company . . . ." Id. at PageID.186.

It is true that Marks signed the retainer "individually" and also as representative of the different client entities, id. at PageID.185, but this does not aid his cause. The agreement defines those obligated to pay the fees and expenses as "Obligors," a term that includes signatories who are "Clients"—a defined term that does not include Marks—and those who sign "individually." Id. at PageID.179-185. By signing the retainer agreement "individually" and becoming liable for fees and expenses, Marks did not convert his non-Client status into Client status, as the retainer expressly declares:

> Although the Clients are to be S&W's sole clients in this matter, by signing below, the Obligors agree to be jointly and severally responsible for payment of S&W's fees and costs and guaranty full payment of same. Additionally, by signing below, each Obligor who is not identified herein as a client, understands and agrees that S&W does not represent him or her, and that he or she does not have authority to instruct S&W to act, or prevent it from acting, with regard to this matter despite his or her obligation to pay S&W's billing statements.

Id. at PageID.182.

There is only one way to read and understand the retainer. Marks was not a client.

Beyond the retainer, Defendants appropriately distinguish Cohen based on other facts, as well.

9

Defendants made clear to the bankruptcy court, not just to Marks, the clients that they represented. Their motion for admission pro hac vice in the bankruptcy suit identifies Defendants as counsel for debtors TMT, Inc.; TMT Leasing, LLC; Tony Marks Equipment, Inc.; and TMT Aero. See Mot. for Admission Pro Hac Vice, Ex. B to FAC (Dkt. 4-2). There is no mention of representing Marks individually.

Defendants also stress that Marks was represented by his own personal counsel, H. Buswell Roberts, Jr. PLLC, at the same time Defendants were addressing the issue of TMT's payroll withholding/FICA taxes. See 6/3/2014 Stipulated Order for Turnover of Proceeds of Tax Reserve Account, Ex. B to Mot. (Dkt. 14-3) (identifying Mayer as the attorney for the debtors and Roberts as attorney for Tony Marks); see also Retainer at PageID.183 (explaining the shared representation and attorney-client privilege agreement with respect to Roberts).

As a rejoinder, Plaintiffs argue that like the plaintiffs in Cohen, Marks sought Defendant's help with an issue that would naturally encompass both himself and TMT. Resp. at 8. He argues that "[i]t is unrealistic to say that Marks hired Defendants to file a Chapter 11 Bankruptcy for his companies, while at the same time paying no regard to the liabilities that could, and did, flow to him personally." Id.

This argument presents a false choice. Marks had the option of retaining his own counsel to protect his individual interests. And he exercised that option by hiring Roberts as his individual counsel. That arrangement does not show that Marks was oblivious to his personal liability. It confirms the opposite—and it confirms that separate lawyers were representing exclusively the interests of different clients. Unlike the client in Cohen, who apparently had no other lawyer representing it, Marks had a separate lawyer representing him.

Although they purport to present countervailing evidence in support of their position, Plaintiffs have presented no legally viable evidence that contradicts the legal significance of the

10

retainer and the fact that Marks was individually represented by his own counsel. In his affidavit, Marks states that he hired Schafer and Weiner, "to represent me and my above entities." Marks Aff. ¶ 4. He states that it was his "understanding that Schafer & Weiner PLLC represented me, individually, as well as the companies listed above." Id. ¶ 5 (referencing the four entities listed as "Clients" in the retainer). However, under Michigan law, "a putative client's subjective belief is insufficient to establish an attorney-client relationship where none exists." Jackson v. Pollick, 941 F.2d 1209, at *2 (6th Cir. Aug. 16, 1991).

Plaintiffs also point to the fact that Defendants were endeavoring, at least in part, to address Marks's individual tax exposure, submitting the July/August 2013 Emails and May 2014 Emails. These emails tend to show that Defendants were working with the goals of (i) helping Marks and his companies pay the IRS in a manner that would insulate Marks from subsequent individual liability, and (ii) providing Marks advice about his potential individual liability. For example, in an email sent on August 29, 2013, Mayer listed among his concerns, "interest that is associated with the trust fund portion of the taxes are [sic] also nondischargeable if Tony [Marks] later files an individual chapter 7 case. So I would like to pay that part too, especially because it appears we have enough money set aside by the Bank to pay them." July/August 2013 Emails at PageID.154.

The July/August 2013 Emails show that Defendants endeavored to structure solutions in a way that might benefit their clients' owner. But while this fact might be relevant for determining whether an implied attorney-client relationship existed in the absence of an unequivocal retainer, it has no relevance where an express contract declared that Defendants did not represent Marks individually. Courts have no commission to ignore a signed contract that sets the terms of an attorney-client relationship. 7 Am. Jur. 2d Attorneys at Law § 137; see also Wilkie v. Auto-Owners Ins. Co., 664 N.W.2d 776, 782 (2003) ("[C]ourts are to enforce the agreement as written absent some highly unusual circumstance. . . . The notion, that free men and women may reach

11

agreements regarding their affairs without government interference and that courts will enforce those agreements, is ancient and irrefutable."). Here, the Court will not interfere with the signed retainer, which can only be read as disavowing an attorney-client relationship between Defendants and Marks individually.

Enforcing retainer agreements as written makes abundant sense, because lawyers often seek to structure their legal efforts in ways that are beneficial to various individuals and entities beyond their clients. Whether in the context of litigation or transactions, legal efforts are often orchestrated so that separate parties on the same side of a matter—and opposing parties as well—will benefit from a strategy that produces benefits both to an attorney's client and to non-clients involved in the matter. If such common-interest efforts could be allowed to override a definitive retainer agreement—and convert a relationship of common cause into an attorney-client relationship—lawyers would never be quite sure to whom they owed their professional duty. Nor would they be confident that the strictures of conflict-of-interest rules did or did not apply, and whether waivers of conflict would be required—and from whom—to stay on the right side of professional responsibility obligations. In a word, the defined contours of a professional relationship would fray into undefined chaos.

Because the retainer and surrounding circumstances made clear that Defendants were not representing Marks individually, Defendants are entitled to summary judgment on this issue. Marks had no attorney-client relationship with Defendants, and, therefore, he has no claim for malpractice against them.

### B. The Statute of Limitations and Statute of Repose

Defendants argue that TMT, Inc.'s claim is barred by the applicable statutes of limitations and repose.[4] However, they are not entitled to summary judgment with respect to TMT, Inc.'s malpractice claim, because genuine disputes of material fact remain.

### 1. Statute of Limitations

Under Michigan law, "[a] legal malpractice claim must be brought within two years of the date the claim accrues, or within six months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later." Kloian v. Schwartz, 725 N.W.2d 671, 675 (Mich. Ct. App. 2006) (citing Mich. Comp. Laws §§ 600.5805(6), 600.5838). Generally, a malpractice claim accrues "on the day that the attorney last provides professional service in the specific matter out of which the malpractice claim arose." Id. at 676.

TMT, Inc. does not argue that it brought its claim within two years of its accrual; instead, it claims it brought its suit within six months of the date when it discovered or should have discovered the existence of its claim.

TMT, Inc. implicitly argues that it knew or should have known about the potential malpractice claim no sooner than it knew or should have known that Marks had been assessed with a trust fund recovery penalty. See Resp. at 9-11. The parties seem to agree that knowledge that Marks had been assessed that penalty would have alerted TMT, Inc. that its trust fund tax obligations had not been satisfied. See id.; Mot. at 17-18. This in turn would have informed TMT, Inc. that Defendants had committed the malpractice alleged: (i) failing to use TMT, Inc.'s funds

---

[4] Although the parties' briefing concerned both Plaintiffs, arguments concerning Marks warrant no further discussion, because Defendants are awarded summary judgment on Marks's malpractice claim due to the lack of an attorney-client relationship with Defendants.

13

to satisfy the trust fund obligation and (ii) improperly advising TMT, Inc. that the trust fund obligation had been satisfied. See FAC ¶ 48.

Accordingly, TMT, Inc. argues that the discovery date was sometime in December 2019, or alternatively, November 23, 2019. According to Marks's affidavit, December 2019 is when an IRS representative came to his home to address this matter. Marks Aff. ¶ 19. According to the IRS account transcript, November 23, 2019 is the date Marks signed a return receipt connected to a notice the IRS sent. IRS Account Transcript at PageID.120.

Defendants argue that TMT, Inc. should have discovered the claim by June 21, 2016. Mot. at 17-18. That was the date when the IRS first assessed a trust fund recovery penalty. IRS Account Transcript at PageID.120. Defendants also argue that TMT, Inc. knew as of September 25, 2013 that the $142,172.13 TMT, Inc. paid in its attempt to satisfy the trust fund obligation was substantially less than the total amount of taxes TMT, Inc. owed. Resp. at 17. By June 21, 2016, Defendants claim, TMT, Inc. "had all the facts necessary for a reasonable person to discover the potential that the IRS would eventually engage in collection action for the balance of any purported tax liability." Resp. at 18.

However, a genuine fact question exists as to whether TMT, Inc. had actual or constructive knowledge of the trust fund recovery penalty assessed to Marks prior to November or December 2019, precluding summary judgment. Marks stated in an affidavit that he did not receive notice of the trust fund recovery penalty assessments until December 2019. Marks Aff. ¶¶ 16-19. At this stage of litigation, when no discovery has been taken, there is little more he can do to prove a negative. Invited by the Court to provide additional evidence that notices allegedly sent by the IRS in 2016, 2017, 2018, and 2019 actually reached Marks, Defendants could provide none. See generally Defs. Suppl. Br. (Dkt. 19). Defendants argue that based on the presumption of regularity—"the idea that courts should assume that government officials 'have properly

14

discharged their official duties'"—the Court should presume that the IRS discharged its obligation to send notices of deficiencies to Marks's last known address. Id. at 2-3 (quoting United States v. Chem. Found., Inc., 272 U.S. 1, 15 (1926)). However, that presumption yields to contrary evidence. See Wiley v. U.S., 20 F.3d 222, 227 (6th Cir. 1994). Marks's affidavit is sufficient to overcome to the presumption of regularity for the time being, although discovery may yield conclusive evidence supporting either party's position.

Defendants also argue that Marks was represented by counsel when the IRS began issuing assessments, Mot. at 17-18; Reply at 5, and that Marks "should have investigated whether the IRS had assessed him with tax and interest prior to the termination of the Chapter 11 Bankruptcy case on September 14, 2017," Reply at 5. However, they do not explain why Marks or his attorneys should have investigated a matter Defendants allegedly told him was resolved. Defendants have not shown, as a matter of law, that the failure by Marks, TMT, Inc., or their attorneys to conduct an independent investigation into the state of Marks's taxes prior to the end of the bankruptcy case means that TMT, Inc. "should have known" about the potential malpractice claim prior to November or December 2019.[5]

---

[5] At times, Defendants appear to argue that mere knowledge that the IRS might eventually assess Marks with a trust fund recovery penalty—knowledge that Defendants claim Marks had by September 2013 or May 2014—put TMT, Inc. on notice of its potential malpractice claim. See Mot. at 17; Reply at 4-5. To the extent Defendants make such an argument, the argument is not sufficiently developed, because it does not explain how TMT, Inc. could or should have known it had suffered malpractice. "In order for a court to conclude as a matter of law that a person has or should have discovered asserted malpractice, it must be shown that the person knew of the act or omission itself and had good reason to believe the act itself was improper or was done in an improper manner." Lefever v. Am. Red Cross, 310 N.W.2d 278, 281 (Mich. Ct. App. 1981) (emphasis added); see also Gebhardt v. O'Rourke, 510 N.W.2d 900, 904-905 (Mich. 1995) (applying the rule that an individual knows or should know about a possible cause of action when she can allege each element of a malpractice claim). Defendants have not identified any obvious or apparent improprieties in their advice or services as early as June 2014 or before. Therefore, Defendants are not entitled to a finding as a matter of law that Plaintiffs were or should have been aware of the malpractice claim in June 2014 or any time prior.

15

## 2. Statute of Repose

Defendants argue that the claim is barred by the statute of repose. Michigan Compiled Laws § 600.5838b provides, in relevant part, the following:

> (1) An action for legal malpractice against an attorney-at-law or a law firm shall not be commenced after whichever of the following is earlier:
> 
> (a) The expiration of the applicable period of limitations under this chapter.
> 
> (b) Six years after the date of the act or omission that is the basis for the claim.

§ 600.5838b; Jones v. Manville, No. 324263, 2016 WL 1125767, at *2 (Mich. Ct. App. Mar. 22, 2016). The six-month discovery rule does not apply to the statute of repose. See Mich. Comp. Laws § 600.5838; Houthoofd v. Law Office of Matthew Reyes, No. 340514, 2018 WL 3551943, at *4 (Mich. Ct. App. July 24, 2018).

According to Defendants, "[t]he entirety of Plaintiffs' legal malpractice claim arises out of Defendants' September 25, 2013 letter regarding the payment of the Trust Fund portion of the payroll/FICA taxes and the subsequent payment of the Trust Fund taxes." Mot. at 14. They argue that although the Chapter 11 Case was not terminated until September 14, 2017, "Defendants' legal services to TMT in the Chapter 11 Case were completed by October 15, 2013, when the Bankruptcy Court issued its Order Granting Final Fee Application, and Defendants did not provide further services to TMT." Id. (citing 10/15/2013 Bankruptcy Ct. Order, Ex. A to Mot. (Dkt. 14-2)).

That order grants Defendants fees and expenses for services rendered from February 1, 2013, through July 19, 2013. However, that document does not prove that October 15, 2013 was the last day they served TMT, Inc. First, Defendants admit to having rendered services after July 19, 2013, so it is unclear what point the order is meant to prove. Second, the order says nothing about Defendants no longer being involved in the case. Third, the May 2014 Emails show that Defendants were somehow involved in the case through May 2014. Fourth, Defendants

16

acknowledge in their motion that "Plaintiffs may argue that Defendants' last date of service regarding the Trust Fund tax liability was June 3, 2014," when the bankruptcy court issued the turnover order, directing Defendants to turn over the remaining balance of funds under the confirmed plan to the creditors' counsel. Mot. at 15. Yet Defendants do nothing to rebut that argument as it relates to the statute of repose.

Defendants attempt to marginalize work performed after September 25, 2013 by claiming, without citing caselaw, that "[t]he statute of repose accrual date is not the date on which the professional engagement ends as is the case with the accrual of the statute of limitations; [r]ather, the accrual date is the date of the alleged malpractice." Reply at 6.

Jones v. Manville discussed the question of when a claim accrues for statute of repose purposes, but it did not resolve it:

> "Accrual of a malpractice action, for purposes of the two-year limitation period, occurs on the last day of professional service." An attorney discontinues serving a client on completion of the particular legal service that the attorney had been retained to perform.
>
> We find it unnecessary to engage in an effort to discern the proper construction of MCL 600.5838 in relationship to MCL 600.5838b, which apparently has not yet been the subject of any published opinion, because Jones's legal malpractice action is time-barred no matter what construction is employed.

2016 WL 1125767 at *2 (internal footnotes and citations omitted).

Likewise, for the time being, this Court need not decide how precisely to interpret the language used in the statute of repose. TMT, Inc. has presented enough evidence to create a genuine fact question as to whether it filed a lawsuit within six years of at least one act or omission that is the basis for its claim. Contrary to Defendants' claim that the malpractice claim arises from Defendants' September 25, 2013 letter, Reply at 6, TMT, Inc.'s suit alleges acts and omissions continuing into May and June of 2014.

17

In support of that contention, Marks states in his affidavit that he had "many . . . discussions with Schafer & Weiner" subsequent to the July/August 2013 Emails, that he remained concerned about his future tax liabilities in May 2014 when the remainder of the money set aside to pay trust fund taxes was to be turned over to the creditors' committee, and that he discussed those concerns by email. Marks Aff. ¶¶ 12-14. Read in the light most favorable to Plaintiffs, the May 2014 Emails support Marks's assertion. In one email, Mayer wrote, "I just spoke with Tony Marks about the $41,009, which represents the remainder of the $260,000 of funds that were originally set aside to pay trust fund taxes." May 2014 Emails at PageID.162. From context, it would be reasonable to infer that Marks and Mayer spoke about whether making that $41,009 payment would satisfy remaining trust fund obligations, and whether any trust fund taxes were still owed. That may have been one instance when, as alleged in the complaint, Defendants incorrectly advised TMT, Inc. that the trust fund taxes had been paid, and when Defendants failed "to properly handle" the trust fund taxes in the bankruptcy proceeding. See FAC ¶ 38.

TMT, Inc. has identified an alleged "act or omission" of malpractice that occurred less than six years before this case was filed. Therefore, Defendants are not presently entitled to summary judgment based on the statute of repose.

### C. Breach of Contract

Under Michigan law, a plaintiff cannot prevail on a claim for breach of contract where the facts support a claim for legal malpractice. McKenzie v. Berggren, 99 F. App'x 616, 620 (6th Cir. 2004). Plaintiffs do not set forth an argument justifying their maintenance of a breach of contract claim by TMT, Inc., in light of the incontrovertible fact that TMT, Inc. had an attorney-client relationship with Defendants, upon which a malpractice claim might be grounded. Accordingly, TMT, Inc.'s breach of contract claim is dismissed.

As to Marks individually, Plaintiffs argue that the rule applied in McKenzie is a rule against redundancy, and that a breach of contract claim is allowed as an alternative pleading where a malpractice claim has failed. Not so. Claims against attorneys on the basis of inadequate representation sound in tort and are governed by malpractice law, "even though a plaintiff may assert that the attorney's actions breached a contract." See Aldred v. O'Hara-Bruce, 458 N.W.2d 671, 673 (Mich. Ct. App. 1990) (applying this principle to hold that the statute of limitations governing attorney malpractice governed such a claim because the attorney was "retained not to perform a specific act but to exercise appropriate legal skill in providing legal representation"). As McKenzie instructs, "The Aldred case has also been interpreted by the Michigan courts as holding that the only claim that may be brought against one's attorney for inadequate legal services is a claim for legal malpractice." 99 F. App'x at 620-621.

Marks's breach of contract claim is for inadequate legal representation. That claim is barred, even though he was not Defendants' client. His breach of contract claim is, therefore, dismissed.

### IV. CONCLUSION

The breach of contract claims brought by both parties are dismissed. Defendants are awarded summary judgment with respect to Marks's malpractice claim. Summary judgment is denied with respects to TMT, Inc's malpractice claim.[6]

SO ORDERED.

Dated: March 19, 2021                   s/Mark A. Goldsmith
    Detroit, Michigan             MARK A. GOLDSMITH
                                          United States District Judge

---

[6] The Court has concerns regarding its jurisdiction to adjudicate the remaining claim and will issue a future order to show cause why the remaining claim should not be dismissed.